THE STATE OF OHIO, APPELLEE, *v*. BODYKE ET AL., APPELLANTS.

[Cite as *State v. Bodyke,* 126 Ohio St.3d 266, 2010-Ohio-2424.]

*Criminal law — R.C. Chapter 2950 — Sex offenders — R.C. 2950.031 and 2950.032 violate separation of powers by requiring executive branch to reclassify sex offenders already classified by court order — Only appellate courts are constitutionally permitted to review or modify court judgments — Executive branch may not reopen final judgments — Stare decisis — Doctrine not controlling in cases presenting constitutional question — R.C. 2950.031 and 2950.032 severed.*

(No. 2008-2502 — Submitted November 4, 2009 — Decided June 3, 2010.)

APPEAL from the Court of Appeals for Huron County, Nos. H-07-040, H-07-041, and H-07-042, 2008-Ohio-6387.

_____

SYLLABUS OF THE COURT

1.  The power to review and affirm, modify, or reverse other courts' judgments is strictly limited to appellate courts.  (Section 3(B)(2), Article IV, Ohio Constitution, applied.)

2.  R.C. 2950.031 and 2950.032, which require the attorney general to reclassify sex offenders who have already been classified by court order under former law, impermissibly instruct the executive branch to review past decisions of the judicial branch and thereby violate the separation-of-powers doctrine.

3.  R.C. 2950.031 and 2950.032, which require the attorney general to reclassify sex offenders whose classifications have already been adjudicated by a court and made the subject of a final order, violate the separation-of-powers doctrine by requiring the opening of final judgments.

_____

**O'CONNOR, J.**

{¶ 1} In this appeal,[1] we decide the constitutionality of the current version of R.C. Chapter 2950, as amended by 2007 Am.Sub.S.B. No. 10 ("the Adam Walsh Act" or "the AWA"), as those provisions apply to sex offenders whose cases were adjudicated prior to its enactment.

{¶ 2} Although we discharge our duty with great respect for the role of the legislature, *Kennedy v. Mendoza-Martinez* (1963), 372 U.S. 144, 159, 83 S.Ct. 554, 9 L.Ed.2d 644, for the reasons that follow we are compelled to find that R.C. 2950.031 and 2950.032, the reclassification provisions in the AWA, are unconstitutional because they violate the separation-of-powers doctrine. As a remedy, we strike R.C. 2950.031 and 2950.032, hold that the reclassifications of sex offenders by the attorney general are invalid, and reinstate the prior judicial classifications of sex offenders.

## I. Relevant Background

### A. R.C. Chapter 2950

{¶ 3} R.C. Chapter 2950, Ohio's law governing the registration and classification of sex offenders and the ensuing community-notification requirements, has evolved substantially since its inception in 1963. See former R.C. Chapter 2950, 130 Ohio Laws 669. The original version of the statute was

---

1. Christian N. Bodyke is an appellant in one of three appeals consolidated by the Sixth District. Bodyke was convicted of sexual battery in 1999. The others, David Schwab and Gerald Phillips, were found guilty of attempted rape in 1999 and gross sexual imposition and sexual battery in 1993, respectively. All of the appellants were classified initially under Megan's Law and reclassified according to the AWA. Bodyke, Schwab, and Phillips assert six propositions of law. Those propositions aver that the application of the AWA to offenders whose crimes were committed before the AWA's effective dates violates (1) the Ex Post Facto Clause of the federal constitution, (2) the Retroactivity Clause of the Ohio Constitution, (3) the separation-of-powers doctrine embodied in the Ohio Constitution, and (4) the Double Jeopardy Clause of the state and federal constitutions. They also assert that the AWA, as applied to sex offenders whose cases were adjudicated under the provisions of Megan's Law, violates due process and constitutional protections against cruel and unusual punishment and against impairment of contracts.

seldom used, *Sears v. State*, Clermont App. No. CA2008-07-068, 2009-Ohio-3541, ¶23, and it existed without amendment for three decades.

**{¶ 4}** In 1994, however, a convicted sex offender in New Jersey abducted, raped, and killed a neighbor's young child, Megan Kanka. See *State v. Williams* (2000), 88 Ohio St.3d 513, 516, 728 N.E.2d 342; *State v. Cook* (1998), 83 Ohio St.3d 404, 405, 700 N.E.2d 570. In the wake of that notorious crime, New Jersey gained national recognition by enacting a law requiring registration of sex offenders and notification to the community of the offender's presence. The law became known as "Megan's Law." *Wallace v. State* (Ind.2009), 905 N.E.2d 371, 374. The constitutionality of the New Jersey legislation was upheld by the New Jersey Supreme Court in *Doe v. Poritz* (1995), 142 N.J. 1, 662 A.2d 367.

**{¶ 5}** Federal legislation followed later that year when Congress enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, Section 14071, Title 42, U.S.Code ("the Jacob Wetterling Act"). The Jacob Wetterling Act focused on requiring states to implement a registry of sex offenders and those who commit crimes against children. *People v. Cintron* (2006), 13 Misc.3d 833, 836, 827 N.Y.S.2d 445, fn. 6. Two years after its enactment, the Act was amended to require that states add community-notification provisions. Id. The Jacob Wetterling Act then became better known as the federal "Megan's Law." Id.

**{¶ 6}** The federal Megan's Law mandates that the states adopt registration and community-notification provisions governing sex offenders or face the loss of federal crime-control funds. Section 14071, Title 42, U.S.Code. The General Assembly enacted Ohio's version of Megan's Law in 1996. Am.Sub.H.B. No. 180, 146 Ohio Laws, Part II, 2560, 2601.[2]

---

2. Although all of the states enacted some form of sex-offender legislation in order to comply with the federal Megan's Law, the breadth of the registration and notification provisions varied from state to state. Sex Offender Treatment in the United States: The Current Climate and an Unexpected Opportunity for Change (2010), 84 Tulane L.Rev. 729, 731.

### 1. Ohio's Megan's Law

{¶ 7} Megan's Law repealed prior versions of R.C. Chapter 2950 and created Ohio's first comprehensive registration and classification system for sex offenders. 146 Ohio Laws, Part II, 2560. In order to accomplish its goals, Ohio's Megan's Law provided for offender registration, classification, and community notification. *Cook*, 83 Ohio St.3d at 407, 700 N.E.2d 570.

{¶ 8} In 1997, we unanimously upheld the application of Megan's Law over retroactivity and ex post facto claims.[3] *State v. Cook* , 83 Ohio St.3d 404, 700 N.E.2d 570.

{¶ 9} After *Cook*, we addressed constitutional challenges to Megan's Law based on theories other than ex post facto and retroactivity. We rejected, unanimously, the suggestions that Megan's Law impermissibly intruded on the individual's rights to maintain privacy, to acquire property, to pursue an occupation, and to maintain a favorable reputation. *Williams*, 88 Ohio St.3d at 524-527, 728 N.E.2d 342. We also rejected arguments based on double jeopardy, bill of attainder, equal protection, and vagueness. Id. at 528-534.

{¶ 10} The following year, we were confronted with a separation-of-powers argument *in State v. Thompson* (2001), 92 Ohio St.3d 584, 752 N.E.2d 276. We rejected it unanimously.

{¶ 11} *Thompson* addressed whether former R.C. 2950.09(B)(2) violated "the separation-of-powers doctrine because it encroache[d] upon the judiciary's fact-finding authority." Id. at 585. More specifically, we addressed the language

---

3. In 2003, the United States Supreme Court confronted an Alaskan statutory scheme very similar to Megan's Law. The high court concluded that the Alaskan law did not violate the Ex Post Facto Clause. *Smith v. Doe* (2003), 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164. In so holding, the court applied the factors from *Kennedy v. Mendoza-Martinez*, 372 U.S. at 159, 83 S.Ct. 554, 9 L.Ed.2d 644, as we did in *Cook,* and drew the same conclusion – that the Ex Post Facto Clause does not prohibit states from retroactively requiring sex offenders to register periodically with local law enforcement or from disseminating to the community the offender's name, address, photograph, and other personal information.

in former R.C. 2950.09(B)(2) that required a judge to consider certain factors before determining whether an offender was a sexual predator.

{¶ 12} Our conclusion that the separation-of-powers doctrine was not violated turned on our view that the statute did not divest the court of its fact-finding powers. Id., 92 Ohio St.3d at 587-588, 752 N.E.2d 276. We observed that the statutory factors provided an important framework that assisted judges in making the sexual-predator determination and that the factors, as guidelines, "provide consistency in the reasoning process." Id. at 587. But more importantly, we recognized that the guidelines did not control the judge's discretion or require a judge to assign a particular weight to certain factors. Thus, we found no improper interference with the judge's fact-finding powers.

{¶ 13} We further held that the factors themselves were nonexhaustive, because the statute directed the judge to "consider all relevant factors, including, but not limited to," the statutory factors. (Emphasis deleted.) Id. at 588. Thus, we concluded, the statute did not violate the separation-of-powers doctrine, because the judge retained discretion to consider any relevant evidence and to determine what weight, if any, to assign to that evidence. Id.

{¶ 14} Ten years after our decision in *Cook*, we again addressed Megan's Law in *State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110. In that case, a convicted rapist classified as a sexual predator challenged the constitutionality of the amendments enacted in Am.Sub.S.B. No. 5 ("S.B. 5"), 150 Ohio Laws, Part IV, 6558, 6687-6702 (eff. July 31, 2003). The claims in *Ferguson* renewed the challenge against the retroactive application of the amended requirements.

{¶ 15} Despite the significant changes wrought by S.B. 5, we upheld the S.B. 5 amendments. In so doing, we rejected Ferguson's assertions that the amendments violated the Ex Post Facto Clause of the United States Constitution (Section 10, Article I) and the retroactivity provision in Section 28, Article II of

the Ohio Constitution.  We relied on our decision in *Cook,* the Supreme Court's decision in *Smith v. Doe* (2003), 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164*,* and other state courts' decisions to find that Megan's Law remained a remedial statute.  *Ferguson* at ¶ 29-40.  *Ferguson,* however, was not unanimous.  See also *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264 (holding that an appellate court must review a trial court's determination in a sex-offender-classification hearing under the civil manifest-weight-of-the-evidence standard).

{¶ 16}  The dissent in *Ferguson* criticized the majority's reliance on *Cook*: "R.C. Chapter 2950 has been amended [since *Cook*].  The simple registration process and notification procedures are now different from those considered in *Cook* and in [*Williams,* 88 Ohio St.3d 513, 2000-Ohio-428, 728 N.E.2d 342]. R.C. Chapter 2950 has been transformed from remedial to punitive * * *." *Ferguson,* 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, ¶ 45 (Lanzinger, J., dissenting).  More specifically, the dissent explained that, since *Cook*, the "sexual predator" label became permanent, the registration requirements were made more demanding, the community-notification and residency-restriction provisions were made more extensive, and sheriffs' authority was expanded to include the power to obtain landlord verification that the offender lived at a registered address.  *Ferguson* at ¶ 46.

{¶ 17} Even as debate over the S.B. 5 amendments was taking place here, however, the General Assembly was reviewing the law and enacting a new scheme, the Adam Walsh Act, R.C. Chapter 2950.  That act, not Megan's Law and its amendments, forms the basis of this appeal.

### 2.  Ohio's Adam Walsh Act

{¶ 18} In 2006, Congress passed the Adam Walsh Child Protection and Safety Act ("Adam Walsh Act"), P.L. No. 109-248, 120 Stat. 587, codified at Section 16901 et seq., Title 42, U.S.Code.  The Act created national standards for sex-offender registration, community notification, and classification.  It divides

sex offenders into three categories or "tiers" – Tier I, Tier II, and Tier III – based solely on the crime committed. Section 16911. The duration of the offender's obligation to update his personal information for the registry depends on his tier classification. Section 16915.

{¶ 19} Section 16912(a) directs every jurisdiction to maintain a sex-offender registry conforming to the requirements of the Act. And to ensure compliance, Congress directed that states that did not adopt the Adam Walsh Act risked losing ten percent of certain federal crime-control funds that would otherwise be allocated to them. Section 16925(a).

{¶ 20} The following year, the General Assembly enacted 2007 Am.Sub.S.B. No. 10.[4] S.B. 10 repealed Megan's Law and replaced it with a new, retroactive scheme that includes the tier system required by Congress. R.C. Chapter 2950.

{¶ 21} The former categories of sexually oriented offender, habitual sex offender, and sexual predator no longer exist, nor is the court required to hold classification hearings as before. Instead, offenders are classified as Tier I, Tier II, or Tier III sex offenders (or child-victim offenders) based solely on the offender's offense. R.C. 2950.01. Specified officials are required to notify existing offenders of their duties and new tier classification. R.C. 2950.03, 2950.031, and 2950.032.

{¶ 22} Significantly for our purposes here, under the AWA judges no longer have discretion to determine which classification best fits the offender. Id.

---

4. Ohio is the only state to have complied with the mandate, however. Greg Bluestein (December 1, 2009), "Ohio lone state to adopt sex-offender rules," in Canton Rep.com, available at http://www.cantonrep.com/ohio/x2072228737/Ohio-lone-state-to-adopt-sex-offender-rules (last visited Mar. 22, 2010). The deadline for compliance has been extended from July 2009 to July 2010, but it appears that many states will still be unable, or unwilling, to comply. Id. For many states, the costs of compliance with the Act will far outweigh the ten percent reduction in funding. For example, it has been estimated that the cost for Illinois to comply with the Act in the first year would be $21,000,000 but that it will lose less than $1,000,000 if it does not. See Liz Winiarski, Facing the Compliance Deadline for the Adam Walsh Child Protection and Safety Act, States are Weighing all the Costs (2009), 14 Pub.Interest L.Rep. 192, 193.

Instead, a few months before the AWA's effective date, the General Assembly directed the attorney general to reclassify existing offenders. R.C. 2950.031(A) and 2950.032(A)(1). Offenders who had registered before December 1, 2007, were to be reclassified as Tier I, II, or III sex offenders according to the new statutes. Id. Tiers are assigned solely by reference to the offense. See R.C. 2950.01(E), (F), and (G). The entire reclassification process is administered by the attorney general, with no involvement by any court. There is no individualized assessment. No consideration is given to any of the other factors employed previously in classification hearings held pursuant to Megan's Law. Id. As a result, the trial court is stripped of any power to engage in independent fact-finding to determine an offender's likelihood of recidivism. Expert testimony is no longer presented; the offender's criminal and social history are no longer relevant.[5]

{¶ 23} After tier classification is completed, the offender is required to register according to the classification. R.C. 2950.04(A)(1). The registration requirements under the AWA vary depending on the tier in which the offender is classified. R.C. 2950.06(B) (frequency of duty to verify personal information differs depending on tier); R.C. 2950.07 (duration of duty to comply with registration/verification requirements depends on tier).

---

5. {¶ a} In *State v. Eppinger* (2001), 91 Ohio St.3d 158, 743 N.E.2d 881, we emphasized the importance of the classification hearing in assessing each offender on an individualized basis, avoiding wholesale labeling of offenders as sexual predators based only on a conviction, and advancing the purpose of the legislation, which was to protect the public:

{¶ b} "If we were to adjudicate all sexual offenders as sexual predators, we run the risk of 'being flooded with a number of persons who may or may not deserve to be classified as high-risk individuals, with the consequence of diluting both the purpose behind and the credibility of the law.'" Id. at 165, quoting *State v. Thompson* (1999), 140 Ohio App.3d 638, 647, 748 N.E.2d 1144.

{¶ c} We further opined that "[o]ne sexually oriented offense is not a clear predictor of whether that person is likely to engage in the future in one or more sexually oriented offenses, particularly if the offender is not a pedophile. Thus, we recognize that one sexually oriented conviction, without more, may not predict future behavior." Id. at 162.

{¶ 24} Under Megan's Law, if an offender was classified at the lowest risk level, i.e., as a sexually oriented offender, he was required to register annually for a period of ten years. Former R.C. 2950.07(B)(3) and 2950.06(B)(2), 146 Ohio Laws, Part II, 2617, 2613. No community notification followed. Under the AWA, although there is still no community notification for the lowest-risk offenders, i.e., offenders classified into Tier I, those offenders must verify their personal information annually for 15 years rather than the ten years required under Megan's Law. R.C. 2950.07(B)(3).

{¶ 25} Under Megan's Law, an offender who posed an intermediate risk, i.e., less than a sexual predator but more than a sexually oriented offender, was labeled a habitual sexual offender. See former R.C. 2950.01(B), 146 Ohio Laws, Part II, 2601. Habitual sexual offenders were required to verify their personal information annually for 20 years, former R.C. 2950.07(B)(2) and 2950.06(B)(2), 146 Ohio Laws, Part II, 2617, 2613, and community notification was required only if the judge deemed it appropriate. Former R.C. 2950.11(A) and (F), 146 Ohio Laws, Part II, 2627, 2630. In the AWA scheme, the intermediate-risk offender is placed in Tier II. Tier II offenders must verify every 180 days for 25 years, R.C. 2950.07(B)(2) and 2950.06(B)(2), but community notification is not required. R.C. 2950.11(F) (community notification limited to Tier III offenders).

{¶ 26} The sexual-predator classification was the highest-risk offender under Megan's Law. Sexual predators were required to register every 90 days for life. Former R.C. 2950.06(B)(1) and 2950.07(B)(1), 146 Ohio Laws, Part II, 2613 and 2616. Community notification was required. Former R.C. 2950.11(A), 146 Ohio Laws, Part II, 2627. Under the AWA, Tier III offenders have the same obligation to verify their personal information as sexual predators, R.C. 2950.06(B)(3) (every 90 days) and 2950.07(B)(1) (for life), and community notification is required. R.C. 2950.11(A). However, the scope of registration is expanded greatly.

**{¶ 27}** Megan's Law required an offender to register with the sheriff in the county in which he resided. Former R.C. 2950.04(A), 146 Ohio Laws, Part II, 2609. Pursuant to the AWA, the offender must register with the sheriff in the county in which he lives, the county in which he attends school, the county in which he is employed, any county in which he is domiciled temporarily for more than three days, and even a county in another state if he works or attends school there. R.C. 2950.04(A)(2)(a) through (e). When he registers, he must provide his full name and any aliases as well as his date of birth, social security number, address, the name and address of his employer and school, the license plate of any motor vehicle he owns or operates as part of his employment, his driver's license number, any professional or occupational registration or license, any e-mail address, and all Internet identifiers or telephone numbers registered to him. R.C. 2950.04(C).

**{¶ 28}** Similarly, the AWA expands community-notification requirements. In the new scheme, the sheriff gives notice of a Tier III offender's name, address, and conviction to all residents within 1,000 feet of the offender's residence. R.C. 2950.11(A)(1)(a). If the offender lives in a multiple-unit building, all residents who share a common hallway with the offender must be notified. R.C. 2950.11(A)(1)(b). The AWA also forbids all sex offenders, including those who have not offended against children, from living within 1,000 feet of a school, preschool, or child day-care facility. R.C. 2950.034(A).[6]

*B. The Appeal Before the Court*

**{¶ 29}** On October 18, 1999, appellant Bodyke entered an agreed plea of no contest to one count of breaking and entering in violation of R.C. 2911.13(A) and one count of sexual battery in violation of R.C. 2907.03(A)(3). Two months

---

6. This court held that this prohibition cannot constitutionally be applied to an offender who bought his home and committed his offense before the effective date of the statute. *Hyle v. Porter,* 117 Ohio St.3d 165, 2008-Ohio-542, 882 N.E.2d 899, syllabus.

later, the trial judge sentenced him to concurrent sentences of six months' imprisonment for breaking and entering and two years' imprisonment for sexual battery. In addition, relying on the version of R.C. 2950.01 that was in effect at that time, he was classified as a sexually oriented offender, the lowest level of offender under Megan's Law. As a sexually oriented offender, Bodyke was required to register with the county sheriff every year for ten years. He was not subject to the community-notification provisions, however.

{¶ 30} In November 2007, eight years after Bodyke's no-contest plea and almost five years after being released from prison, the attorney general, acting pursuant to the reclassification provisions in the AWA, notified Bodyke that he would be reclassified. Bodyke was automatically labeled a Tier III offender, which requires him to personally register with the local sheriff every 90 days for the duration of his life. Further, Bodyke is now subject to community-notification provisions.

{¶ 31} He appealed to the Sixth District Court of Appeals, which affirmed unanimously. We accepted his discretionary appeal, 121 Ohio St.3d 1438, 2009-Ohio-1638, 903 N.E.2d 1222, and now reverse.

## II. Analysis

### A. Stare Decisis

{¶ 32} The parties and amici curiae repeatedly urge that *Cook* and *Ferguson* compel a particular result here, and some suggest that the doctrine of stare decisis controls the outcome. As we have described here, this court has repeatedly upheld Megan's Law as constitutional over an array of challenges. But those decisions compel no particular result in the cases before us.

{¶ 33} Initially, we reiterate an important but often overlooked aspect of our law on stare decisis. We have held that "stare decisis applies to rulings rendered in regard to specific statutes, [but] it is limited to circumstances 'where the facts of a subsequent case are substantially the same as a former case.' "

*Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 23, quoting *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 5, 539 N.E.2d 103. Thus, as a threshold question, we must determine whether the statute and facts presented today are the same as those presented in precedent. We are persuaded that the AWA is substantially different from Megan's Law. *Cook* and *Ferguson*, the cases cited as dispositive of this appeal, did not present a separation-of-powers challenge. And *Thompson*, which did, involved a statutory provision not implicated in this appeal because *Thompson* was concerned *only* with former R.C. 2950.09(B)(2), the provision listing factors a judge was required to consider in determining whether an offender is a sexual predator. 92 Ohio St.3d at 584, 752 N.E.2d 276 ("The sole issue before this court is whether R.C. 2950.09 violates the separation-of-powers doctrine because it encroaches upon the judiciary's fact-finding authority. We find that it does not"). Nothing like that provision can be found in the AWA.

{¶ 34} On those bases alone, we would not be obliged to apply those decisions to this case. But more importantly for our purposes here, we believe that there is a more vital and compelling limitation on the doctrine as it has developed in Ohio: its inapplicability to constitutional claims.

{¶ 35} Our decision in *Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, established the test for departing from precedent. But *Galatis* arose in the context of insurance and contract law, not constitutional law. That difference is significant, as we made clear in our decision in *Rocky River,* 43 Ohio St.3d at 6-10, 539 N.E.2d 103. In that case, we acknowledged that stare decisis "does not apply with the same force and effect *when constitutional interpretation is at issue."* (Emphasis added.) Id.

{¶ 36} We concluded in *Rocky River* by noting that the reconsideration of past decisions in the constitutional realm "is not some forbidden aberration. It is, in fact, the fulfillment of our constitutional responsibilities * * *." Id. at 7.

Nothing in our decision in *Galatis* suggests otherwise. *Rocky River* retains its vitality, at least insofar as this principle is concerned: "*Stare decisis* is *not* inflexibly applicable to constitutional interpretation." (Emphasis sic.) Id. at 10. See also *Lawrence v. Texas* (2003), 539 U.S. 558, 577, 123 S.Ct. 2472, 156 L.Ed.2d 508 ("The doctrine of *stare decisis* is essential to the respect accorded to the judgments of the Court and the stability of the law. It is not, however, an inexorable command").

{¶ 37} Stare decisis remains a controlling doctrine in cases presenting questions on the law of contracts, property, and torts, but it is not controlling in cases presenting a constitutional question. Thus, in the instant appeals, stare decisis does not compel us to reach the same result we reached in past decisions, including *Ferguson* and *Cook*.

{¶ 38} We now proceed with our analysis of the important constitutional questions before us.

## B. Separation-of-Powers Doctrine

{¶ 39} The first, and defining, principle of a free constitutional government is the separation of powers. *Evans v. State* (Del.2005), 872 A.2d 539, 543. In *Kilbourn v. Thompson* (1880), 103 U.S. 168, 190-191, 26 L.Ed. 377, the United States Supreme Court stated:

{¶ 40} "It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to

13

the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other."

{¶ 41} As this court has observed with regard to our own state system of government:

{¶ 42} "While Ohio, unlike other jurisdictions, does not have a constitutional provision specifying the concept of separation of powers, this doctrine is implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government." *S. Euclid v. Jemison* (1986), 28 Ohio St.3d 157, 158-159, 28 OBR 250, 503 N.E.2d 136. It "represents the constitutional diffusion of power within our tripartite government. The doctrine was a deliberate design to secure liberty by simultaneously fostering autonomy and comity, as well as interdependence and independence, among the three branches." *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 114.

{¶ 43} " ' "[T]he people possessing all governmental power, adopted constitutions, completely distributing it to appropriate departments." *Hale v. State* (1896), 55 Ohio St. 210, 214, 45 N.E. 199, 200. They vested the legislative power of the state in the General Assembly (Section 1, Article II, Ohio Constitution), the executive power in the Governor (Section 5, Article III, Ohio Constitution), and the judicial power in the courts (Section 1, Article IV, Ohio Constitution).' " *Norwood* at ¶ 115, quoting *State ex rel. Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 462, 715 N.E.2d 1062.

{¶ 44} "The essential principle underlying the policy of the division of powers of government into three departments is that powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments, and further that none of them ought to possess directly or indirectly an overruling influence over the others." *State ex rel. Bryant*

*v. Akron Metro. Park Dist. of Summit Cty.* (1929), 120 Ohio St. 464, 473, 166 N.E. 407. Thus, the people specified in our Constitution that "[t]he general assembly shall [not] * * * exercise any judicial power, not herein expressly conferred." Section 32, Article II, Ohio Constitution. Our decisions reflect these principles.

{¶ 45} We have held that "[t]he administration of justice by the judicial branch of the government cannot be impeded by the other branches of the government in the exercise of their respective powers." *State ex rel. Johnston v. Taulbee* (1981), 66 Ohio St.2d 417, 20 O.O.3d 361, 423 N.E.2d 80, paragraph one of the syllabus.

{¶ 46} The judiciary has both the power and the solemn duty to determine the constitutionality and validity of acts by other branches of the government and to ensure that the boundaries between branches remain intact. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 462, 715 N.E.2d 1062. "[J]urists have long understood that they must be wary of any usurpation of the powers conferred on the judiciary by constitutional mandate and any intrusion upon the courts' inherent powers * * *." *Norwood,* 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, at ¶ 115. We therefore must "jealously guard the judicial power against encroachment from the other two branches of government and * * * conscientiously perform our constitutional duties and continue our most precious legacy." *Sheward* at 467.

{¶ 47} Our vigilance is not born of self-reverence. Rather, we protect the borders separating the three branches in order to ensure the security and harmony of the government, *Weaver v. Lapsley* (1869), 43 Ala. 224, 1869 WL 503, *5, and to avoid the evils that would flow from legislative encroachment on our independence. *Lawson v. Jeffries* (1873), 47 Miss. 686, 1873 WL 4108, *8. As Montesquieu warned, " '[w]hen the legislative and executive powers are united in the same person, or in the same body of magistracy, there can be then no liberty *

* *. [And] there is no liberty, if the power of judging be not separated from the legislative and executive powers.' " *Evans v. State,* 872 A.2d at 544, quoting Baron de Montesquieu, The Spirit of the Laws (Thomas Nugent trans., 1949), fn. 39. See also *Clinton v. New York* (1998), 524 U.S. 417, 450, 118 S.Ct. 2091, 141 L.Ed.2d 393 (the separation-of-powers doctrine guards against the threat to liberty posed by the concentration of power in a single branch of government).

{¶ 48} But the doctrine also recognizes that our government is composed of equal branches that must work collectively toward a common cause. And in doing so, the Constitution permits each branch to have some influence over the other branches in the development of the law. For example, the legislative branch plays an important and meaningful role in the criminal law by defining offenses and assigning punishment, while the judicial branch has its equally important role in interpreting those laws.

{¶ 49} As the Supreme Court has explained, the Madisonian vision of the separation of powers did not contemplate three branches operating in isolation, each without influence over the others. Rather, the doctrine was designed to protect against " 'the *whole* power of one department [being] exercised by the same hands which possess the *whole* power of another department,' " in which case " 'the fundamental principles of a free constitution, are subverted.' " (Emphases sic.) *Mistretta v. United States* (1989), 488 U.S. 361, 380-382, 109 S.Ct. 647, 102 L.Ed.2d 714, quoting The Federalist No. 47 (J. Cooke Ed.1961) 325-326. The court reminds us of Madison's belief that "our constitutional system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence * * *." *Mistretta,* id.

{¶ 50} Navigating the boundaries between interdependence and independence of the branches is not always easy. But we have guideposts to aid us.

**{¶ 51}** Foremost in the analysis, we recognize that the Founders' design of the tripartite model was intended to serve as " 'a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.' " *Mistretta,* 484 U.S. at 382, 109 S.Ct. 647, 102 L.Ed.2d 714, quoting *Buckley v. Valeo* (1976), 424 U.S. 1, 122, 96 S.Ct. 612, 46 L.Ed.2d 659. The Supreme Court counsels that "this concern of encroachment and aggrandizement" animates judicial decisions on the separation of powers and arouses vigilance against the " 'hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power.' " *Mistretta,* 488 U.S. at 382, quoting *Immigration & Naturalization Serv. v. Chadha* (1983), 462 U.S. 919, 951, 103 S.Ct. 2764, 77 L.Ed.2d 317. The court has "not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch." *Mistretta,* id.

**{¶ 52}** Thus, while we must respect the fact that the authority to legislate is for the General Assembly alone, we must also ensure that its legislative prerogative is not unbridled. The General Assembly cannot require the courts "to treat as valid laws those which are unconstitutional. If this could be permitted, the whole power of the government would at once become absorbed and taken into itself by the Legislature." *Bartlett v. State* (1905), 73 Ohio St. 54, 58, 75 N.E. 939. We must be wary that the legislature, in discharging its own duties, does not accrete power and encroach on the province of the judiciary.

**{¶ 53}** In cases specifically involving the judicial branch, the Supreme Court advises vigilance against two dangers: "that the Judicial Branch neither be assigned nor allowed 'tasks that are more properly accomplished by [other] branches,' *Morrison v. Olson* [1988], 487 U.S. [654] 680-681 [108 S.Ct. 2597, 101 L.Ed.2d 569], and, second, that no provision of law 'impermissibly threatens the institutional integrity of the Judicial Branch.' *Commodity Futures Trading*

*Comm'n. v. Schor* [1986], 478 U.S. [833], at 851 [106 S.Ct. 3245, 92 L.Ed.2d 675]." *Mistretta*, 488 U.S. at 383, 109 S.Ct. 647, 102 L.Ed.2d 714. Courts also condemn legislative encroachments that violate the separation of powers by vesting officials in the executive branch with the power to review judicial decisions or by commanding that the courts reopen final judgments. *Plaut v. Spendthrift Farm, Inc.* (1995), 514 U.S. 211, 218-219, 115 S.Ct. 1447, 131 L.Ed.2d 328.

**{¶ 54}** With these principles in mind, we turn to a key aspect of the AWA – the reclassification scheme. That scheme requires the attorney general to reclassify offenders who previously were classified by Ohio judges according to the provisions in Megan's Law and its precursor.

1. The reclassification provisions

violate the separation-of-powers doctrine

**{¶ 55}** The AWA's provisions governing the reclassification of sex offenders already classified by judges under Megan's Law violate the separation-of-powers doctrine for two related reasons: the reclassification scheme vests the executive branch with authority to review judicial decisions, and it interferes with the judicial power by requiring the reopening of final judgments. It is well settled that a legislature cannot enact laws that revisit a final judgment. We have held for over a century that "the Legislature cannot annul, reverse, or modify a judgment of a court already rendered." *Bartlett v. State,* 73 Ohio St. at 58, 75 N.E. 939. See also *United States v. O'Grady* (1874), 89 U.S. (22 Wall.) 641, 647-648, 22 L.Ed. 772 ("Judicial jurisdiction implies the power to hear and determine a cause, and * * * Congress cannot subject the judgments of the Supreme Court to the re-examination and revision of any other tribunal or any other department of the government"). As the Supreme Court of California recently explained, "judgments cannot be deprived of their 'finality' through statutory conditions not in effect when the judicial branch gave its 'last word' in the particular case,"

regardless of the policy behind the legislation. *People v. King* (2002), 27 Cal.4th 29, 35, 115 Cal.Rptr.2d 214, 37 P.3d 398, citing *Plaut*, 514 U.S. at 227, 230, 115 S.Ct. 1447, 131 L.Ed.2d 328. "A judgment which is final by the laws existing when it is rendered cannot constitutionally be made subject to review by a statute subsequently enacted * * *." *Gompf v. Wolfinger* (1902), 67 Ohio St. 144, 65 N.E. 878, at paragraph three of the syllabus. See also *Plaut*, 514 U.S. at 222, quoting The Federalist No. 81 (J. Cooke Ed.1961) 545 (" 'A legislature without exceeding its province cannot reverse a determination once made, in a particular case * * *' "). The reclassification provisions violate these bedrock principles.

**{¶ 56}** The reclassification scheme in the AWA works to "legislatively vacate[] the settled and journalized final judgments of the judicial branch of government." *State v. Russell*, Trumbull App. No. 2008-T-0074, 2009-Ohio-5213, ¶ 93 (Grendell, J., concurring in judgment only). The legislative attempt to reopen journalized final judgments imposing registration and community-notification requirements on offenders so that new requirements may be imposed suffers the same constitutional infirmity. "It does not matter that the legislature has the authority to enact or amend laws requiring sex offenders to register or that the current Sex Offender Act does not order the courts to reopen final judgments. The fact remains that the General Assembly 'cannot annul, reverse, or modify a judgment of a court already rendered.' *Bartlett*, 73 Ohio St. at 58, 75 N.E. 939. [Reclassification], as a practical matter, nullifies that part of the court's [initial classification] Judgment [in this case] ordering [the offender] to register for a period of ten years as a sexually oriented offender. To assert that the General Assembly has authority to create a new system of classification does not solve the problem that [the] original classification constituted a final judgment. There is no exception to the rule that the final judgments may not be legislatively annuled [sic] in situations where the Legislature has enacted new legislation." *State v.*

*Grate*, Trumbull App. No. 2008-T-0058, 2009-Ohio-4452, 2009 WL 2710100, ¶16.

{¶ 57} Just as "Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch" or interfere with the judiciary by "commanding the federal courts to reopen final judgments," *Plaut*, 514 U.S. at 218, 219, 115 S.Ct. 1447, 131 L.Ed.2d 328, the General Assembly cannot vest authority in the attorney general to reopen and revise the final decision of a judge classifying a sex offender.

{¶ 58} Our Constitution and case law make undeniably clear that the judicial power resides exclusively in the judicial branch. *Ex parte Logan Branch of State Bank of Ohio* (1853), 1 Ohio St. 432, 434. The judicial power of the state is vested exclusively in the courts. Section 1, Article IV, Ohio Constitution. The power to review and affirm, modify, or reverse other courts' judgments is strictly limited to appellate courts. Section 3(B)(2), Article IV, Ohio Constitution. The AWA intrudes on that exclusive role and thus violates the separation-of-powers doctrine.

{¶ 59} Moreover, once the final judgment has been opened, the AWA requires that the attorney general "shall determine" the new classifications of offenders and delinquent children who were classified by judges under the former statutes. R.C. 2950.031(A)(1) and 2950.032(A)(1)(a) and (b). In doing so, it violates a second prohibition by assigning to the executive branch the authority to revisit a judicial determination.

{¶ 60} Thus, we conclude that R.C. 2950.031 and 2950.032, which require the attorney general to reclassify sex offenders who have already been classified by court order under former law, impermissibly instruct the executive branch to review past decisions of the judicial branch and thereby violate the separation-of-powers doctrine.

{¶ 61} We further conclude that R.C. 2950.031 and 2950.032, which require the attorney general to reclassify sex offenders whose classifications have already been adjudicated by a court and made the subject of a final order, violate the separation-of-powers doctrine by requiring the opening of final judgments.

{¶ 62} In light of our conclusion that the reclassification provision is unconstitutional, we decline to address the remaining constitutional claims at this time. The sole remaining salient question is, Which remedy to apply? See *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 84.

2. Severance is the proper remedy

{¶ 63} As we did in *Foster*, "[w]e presume that compliance with the United States and Ohio Constitutions is intended and that an entire statute is intended to be effective. R.C. 1.47(A) and (B). Furthermore, R.C. 1.50 states, 'If any provision of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, *the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision* or application, and to this end the provisions are severable.' (Emphasis added.)

{¶ 64} "When this court holds that a statute is unconstitutional, severance may be appropriate. * * * Severance is suitable, however, only where it satisfies our well-established standard. * * *

{¶ 65} "* * * Three questions are to be answered before severance is appropriate. ' " '(1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?' "' *Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845

N.E.2d 470, ¶ 93-95, quoting *Geiger v. Geiger* (1927), 117 Ohio St. 451, 466, 160 N.E. 28, quoting *State v. Bickford* (1913), 28 N.D. 36, 147 N.W. 407, paragraph 19 of the syllabus.

{¶ 66} Applying these standards, we conclude that severance of R.C. 2950.031 and 2950.032, the reclassification provisions in the AWA, is the proper remedy. By excising the unconstitutional component, we do not "detract from the overriding objectives of the General Assembly," i.e., to better protect the public from the recidivism of sex offenders, and the remainder of the AWA, "which is capable of being read and of standing alone, is left in place." *Foster* at ¶ 98. We therefore hold that R.C. 2950.031 and 2950.032 are severed and, that after severance, they may not be enforced. R.C. 2950.031 and 2950.032 may not be applied to offenders previously adjudicated by judges under Megan's Law, and the classifications and community-notification and registration orders imposed previously by judges are reinstated.

### III. Conclusion

{¶ 67} For the foregoing reasons, we hold that R.C. 2950.031 and 2950.032, which require the attorney general to reclassify sex offenders who have already been classified by court order under former law, impermissibly instruct the executive branch to review past decisions of the judicial branch and thereby violate the separation-of-powers doctrine. In addition, R.C. 2950.031 and 2950.032 violate the separation-of-powers doctrine by requiring the opening of final judgments.

Judgments reversed.

LUNDBERG STRATTON and LANZINGER, JJ., concur.

PFEIFER, J., concurs in the syllabus and judgment.

O'DONNELL, J., concurs in part and dissents in part.

CUPP, J., dissents.

BROWN, C.J., not participating.

_____

**O'DONNELL, J., concurring in part and dissenting in part.**

{¶ 68} I agree with the lead opinion that 2007 Am.Sub.S.B. No. 10 violates the separation-of-powers doctrine because the applicable statutes require the attorney general, a member of the executive branch of government, to reclassify sexual offenders who have been previously classified as either sexually oriented offenders, habitual sexual offenders, or sexual predators in accordance with a determination by a member of the judicial branch of government. However, I dissent from that part of the lead opinion discussing the doctrine of stare decisis, because it is wholly dicta and superfluous to the decision of the lead opinion that the reclassification provisions of S.B. 10 are unconstitutional.

**Separation of Powers**

{¶ 69} In October 1999, Christian Bodyke entered no-contest pleas to breaking and entering and sexual battery. The trial court sentenced him to an aggregate two-year term of imprisonment and declared him a sexually oriented offender pursuant to statutes in effect at that time. As a sexually oriented offender, Bodyke had the duty to register every year for ten years and was not subject to community notification. See former R.C. 2950.07(B)(3) and (B)(2), 146 Ohio Laws, Part II, 2617, 2613; former R.C. 2950.11(A) and (F), id. at 2626-2627, 2630.

{¶ 70} In 2006, Congress passed the Adam Walsh Child Protection and Safety Act, Section 16901 et seq., Title 42, U.S.Code, and provided financial incentives to states for creating similar legislation. See Section 16925(a). Ohio became the first state in the nation to follow suit and enacted S.B. 10.

{¶ 71} In November 2007, Attorney General Marc Dann notified Bodyke that he had been reclassified as a Tier III sexual offender pursuant to newly enacted S.B. 10. As a result of the Tier III reclassification, Bodyke had new registration requirements in that he had to register every 90 days for life and also

became subject to community notification. R.C. 2950.06(B)(3), 2950.07(B)(1), and 2950.11(A).

{¶ 72} Former R.C. 2950.09(B)(1) mandated that the trial court conduct a hearing and determine whether to adjudicate an offender to be a sexual predator or a habitual sexual offender. 146 Ohio Laws, Part II, 2618. Former R.C. 2950.09(B)(2) and (3) required the court to weigh listed factors to "determine by clear and convincing evidence whether the offender is a sexual predator." See 146 Ohio Laws, Part II, 2618-2619. If the court found that the offender was not a sexual predator, the statute directed it to "specify in the offender's sentence and the judgment of conviction * * * that the offender is not a sexual predator." Former R.C. 2950.09(E) required the court to specify in its entry whether it had determined the offender to be a habitual sexual offender. 146 Ohio Laws, Part II, 2624.

{¶ 73} This statute thus directed the trial court to determine whether an offender was a sexual predator or a habitual sexual offender; by implication, the court also determined if an offender was a sexually oriented offender. See *State v. Cook* (1998), 83 Ohio St.3d 404, 407, 700 N.E.2d 570 ("A sexually oriented offender is one who has committed a 'sexually oriented offense' as that term is defined in R.C. 2950.01(D) but who does not fit the description of either habitual sex offender or sexual predator").

{¶ 74} In Bodyke's case, the trial court's judgment of conviction reflects that it "adjudicated" Bodyke to be a sexually oriented offender. Therefore, when the General Assembly directed the attorney general to reclassify him, it impermissibly invaded the province of the judiciary by mandating the reopening of a final judgment and by directing that a judicial function be performed by a member of the executive branch of government. As we stated in *Bartlett v. State* (1905), 73 Ohio St. 54, 58, 75 N.E. 939, "it is well settled that the Legislature cannot annul, reverse, or modify a judgment of a court already rendered * * *."

See also *Gompf v. Wolfinger* (1902), 67 Ohio St. 144, 65 N.E. 878, paragraph three of the syllabus ("A judgment which is final by the laws existing when it is rendered cannot constitutionally be made subject to review by a statute subsequently enacted * * *").

{¶ 75} Accordingly, I concur with the lead opinion's holding that S.B. 10 is unconstitutional in that it requires the attorney general, a member of the executive branch of government, to reclassify sex offenders who had previously been adjudicated and classified pursuant to a final order of a court.

### Stare Decisis

{¶ 76} I dissent from the lead opinion, however, regarding its statements about the inapplicability of the doctrine of stare decisis to constitutional claims. The lead opinion in doing so reaches to decide a question that does not need to be resolved at this time.

{¶ 77} Initially, it should be noted that neither party has specifically asserted or briefed the issue of what role stare decisis should play in ruling on constitutional questions. We therefore should not raise this question on our own initiative, because as we explained in *Sizemore v. Smith* (1983), 6 Ohio St.3d 330, 333, 6 OBR 387, 453 N.E.2d 632, fn. 2, "[i]t has long been the policy of this court not to address issues not raised by the parties. * * * This court should be hesitant to decide such matters for the reason that justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination."

{¶ 78} "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan* (C.A.D.C.1983), 714 F.2d 171, 177. Proceeding to decide an issue not briefed by the parties creates " 'the risk "of an improvident or ill-advised opinion, given [the court's] dependence * * * on the

adversarial process for sharpening the issues for decision." ' " *Carbino v. West* (C.A.Fed.1999), 168 F.3d 32, 35, quoting *Headrick v. Rockwell Internatl. Corp.* (C.A.10, 1994), 24 F.3d 1272, 1278, quoting *Herbert v. Natl. Academy of Sciences* (C.A.D.C.1992)*,* 974 F.2d 192, 196.

{¶ 79} As the lead opinion admits, we have not before had an opportunity to consider the constitutionality of the reclassification provisions of S.B. 10. Thus, the lead opinion's discussion of the role of stare decisis in constitutional interpretation is unnecessary to reach its holding that these reclassification provisions violate the separation-of-powers doctrine.

{¶ 80} We usually decline to rule on questions that are not necessary to a proper disposition of a case. This restriction exists because "[a] hallmark of judicial restraint is to rule only on those cases that present an actual controversy. To do otherwise – to simply answer a hypothetical question merely for the sake of answering it – would make this court nothing more than an advisory board." *Ahmad v. AK Steel Corp.*, 119 Ohio St.3d 1210, 2008-Ohio-4082, 893 N.E.2d 1287, ¶ 3 (O'Connor, J., concurring). See also *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, 51 O.O.2d 35, 257 N.E.2d 371 ("It has been long and well established that it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect").

{¶ 81} Here, there is no actual controversy between the parties over how the doctrine of stare decisis should apply when the meaning of the Constitution is at issue, and any attempt to unnecessarily decide that question in this case contravenes well-settled law that this court will not issue advisory opinions. *State ex rel. White v. Kilbane Koch*, 96 Ohio St.3d 395, 2002-Ohio-4848, 775 N.E.2d 508, ¶ 18, citing *State ex rel. Baldzicki v. Cuyahoga Cty. Bd. of Elections* (2000), 90 Ohio St.3d 238, 242, 736 N.E.2d 893, and *Egan v. Natl. Distillers & Chem. Corp.* (1986), 25 Ohio St.3d 176, 25 OBR 243, 495 N.E.2d 904, syllabus.

{¶ 82} To compound the problem, the lead opinion goes too far in concluding that the doctrine of stare decisis is inapplicable to constitutional claims.  We previously stated in *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 5, 539 N.E.2d 103, that stare decisis "does not apply *with the same force and effect* when constitutional interpretation is at issue."  (Emphasis added.)  But stating that stare decisis applies with *less force* is a far cry from the proposition that it is wholly *inapplicable*, and it is telling that the lead opinion musters no direct authority for this overbroad holding.

{¶ 83} Fidelity to precedent is "vital to the proper exercise of the judicial function * * * [and] 'is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' " *Citizens United v. Fed. Election Comm.* (2010), ___ U.S. ___, 130 S.Ct. 876, 920, ___ L.Ed.2d ___, quoting *Payne v. Tennessee* (1991)*,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720.

{¶ 84} Thus, as the Supreme Court of the United States has acknowledged, " 'even in constitutional cases, the doctrine [of stare decisis] carries such persuasive force that we have always required a departure from precedent to be supported by some "special justification." ' " *Dickerson v. United States* (2000), 530 U.S. 428, 443, 120 S.Ct. 2326, 147 L.Ed.2d 405, quoting *United States v. Internatl. Business Machines Corp.* (1996)*,* 517 U.S. 843, 856, 116 S.Ct. 1793, 135 L.Ed.2d 124, quoting *Payne* at 842 (Souter, J., concurring). See also *Citizens United*, ___ U.S. at ___, 130 S.Ct. at 921, ___ L.Ed.2d ___ ("It follows that in the unusual circumstance when fidelity to any particular precedent does more to damage this constitutional ideal than to advance it, we must be more willing to depart from that precedent").

{¶ 85} Moreover, while the lead opinion asserts that the tripartite test for departing from precedent that we adopted in *Westfield Ins. Co. v. Galatis*, 100

Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, has no application to constitutional questions, the court in *Galatis* specifically recognized that "the United States Supreme Court utilized a similar trifold stare decisis test in *Lawrence v. Texas* (2003), 539 U.S. 558, [574-578] 123 S.Ct. 2472, 2482-2483, 156 L.Ed.2d 508." *Galatis* at ¶ 48, fn. 5. *Lawrence* involved the question whether to overrule *Bowers v. Hardwick* (1986)*,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140, on the question whether *the constitution* permits prosecution for private acts of homosexual sex. Further, the Supreme Court of the United States in *Lawrence* derived the test from *Planned Parenthood of Southeastern Pennsylvania v. Casey* (1992)*,* 505 U.S. 833, 855, 112 S.Ct. 2791, 120 L.Ed.2d 674, which itself dealt with the question whether to overrule *Roe v. Wade* (1973)*,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, on a question of constitutional interpretation.

{¶ 86} My point is not to plot the precise boundaries of the application of stare decisis to constitutional questions – that issue is not before the court. Rather, I only emphasize that it is by no means clear that the doctrine of stare decisis and the *Galatis* test are wholly inapplicable to cases involving constitutional issues. We should await a case presenting concrete facts and parties actively litigating and properly briefing the question, which may reveal additional arguments for retaining or modifying the *Galatis* framework in cases of constitutional import.

{¶ 87} Lastly, it is ironic that the lead opinion's statement on the binding power of precedent is itself obiter dictum that compels no obedience. A court is not bound to follow its own dicta from a prior case in which the point at issue "was not fully debated." *Cent. Virginia Community College v. Katz* (2006), 546 U.S. 356, 363, 126 S.Ct. 990, 163 L.Ed.2d 945; see also *Cosgrove v. Williamsburg of Cincinnati Mgt. Co., Inc.* (1994), 70 Ohio St.3d 281, 284, 638

N.E.2d 991 (explaining that dicta in a prior case "has no binding effect on this court's decision in this case").

{¶ 88} As Chief Justice Marshall explained long ago in *Cohens v. Virginia* (1821)*,* 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257, "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."

{¶ 89} After all, "[t]he problem with dicta, and a good reason that it should not have the force of precedent for later cases, is that when a holding is unnecessary to the outcome of a case, it may be made with less care and thoroughness than if it were crucial to the outcome." *Bauer v. Garden City* (1987), 163 Mich.App. 562, 571, 414 N.W.2d 891.

{¶ 90} I am reminded of Chief Justice Roberts's statement in *PDK Laboratories, Inc. v. United States Drug Enforcement Adm.* (C.A.D.C.2004), 362 F.3d 786, 799 (Roberts, J., concurring in part and concurring in the judgment), where he wrote that the "the cardinal principle of judicial restraint [is that] if it is not necessary to decide more, it is necessary not to decide more." In *Meyer v. United Parcel Serv., Inc.*, 122 Ohio St.3d 104, 2009-Ohio-2463, 909 N.E.2d 106, ¶ 53, we followed this limitation, citing this very quotation.

{¶ 91} For these reasons, while I agree with the lead opinion that the reclassification provisions of S.B. 10 violate the doctrine of the separation of powers, I cannot join the lead opinion's unnecessary ruminations on the doctrine of stare decisis. Accordingly, I concur in the judgment that reclassification of sexual offenders who have previously been classified by members of the judicial branch of government by the Attorney General of Ohio, a member of the executive branch of government, violates the separation-of-powers doctrine, but dissent from the remainder of the opinion.

_____

**CUPP, J., dissenting.**

{¶ 92} I respectfully dissent.

{¶ 93} The lead opinion errs, in my view, in holding that the reclassification sections of 2007 Am.Sub.S.B. No. 10 and the consequent change in registration and reporting requirements for offenders previously classified under prior law violate the separation-of-powers doctrine and, therefore, render new sections R.C. 2950.031 and 2950.032 unenforceable.

{¶ 94} The lead opinion's premise is that because a sex-offender classification under Megan's Law is included within the defendant's criminal judgment (along with the conviction and sentence for the underlying crime) or in a separate entry (e.g., when the sex-offense conviction predated Megan's Law), the classification is a final judgment that the General Assembly may not overturn or vacate by legislative mandate.

{¶ 95} It is true that the General Assembly may not overturn a final judgment at law by legislative mandate. *Plaut v. Spendthrift Farm, Inc.* (1995), 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328; *Gompf v. Wolfinger* (1902), 67 Ohio St. 144, 152, 65 N.E. 878. But to characterize S.B. 10 as "reopening" a final judgment is, I believe, inaccurate. S.B. 10 does not upend the original conviction and sentence. They remain in place.

{¶ 96} Instead, S.B. 10 applies a new, different system of sex-offender classification to the fact of the criminal conviction. What this court said in describing the then new, different classification system in the amended Megan's Law also holds true for S.B. 10. In *State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, ¶ 34, we observed that "an offender's classification as a sexual predator is a *collateral consequence of the offender's criminal acts* rather than a form of punishment per se." (Emphasis added.)

{¶ 97} In this case, the manner in which appellants' sex-offender classifications were effected under the prior law does not support the lead opinion's conclusion that they constituted a final judicial judgment. The trial court declared appellant Bodyke to be a "sexually oriented offender," which was reflected in his sentencing judgment. Appellant Phillips was convicted and sentenced before the effective date of Megan's Law. After that law went into effect, the trial court notified Phillips that it would consider whether to classify him as a sexual predator. No hearing was held in Phillips's case to determine if he was a predator, because the state informed the trial court by motion that it did not seek to classify Phillips as a sexual predator. Phillips thus remained a "sexually oriented offender" by virtue of his criminal conviction. See *State v. Hayden*, 96 Ohio St.3d 211, 2002-Ohio-4169, 773 N.E.2d 502, ¶ 16. Appellant Schwab was declared to be a habitual sexual offender without community-notification requirements, which was memorialized in his sentencing entry. The sentencing entry for Schwab states that "[t]he Defendant and the State jointly stipulated that the Defendant is an habitual Sexual Offender."

{¶ 98} As this court has noted, under Megan's Law, conviction of a sexually oriented offense "automatically conferred on [the offender] the status of a sexually oriented offender," and the registration requirement "is mandated by law." *State v. Hayden*, 96 Ohio St.3d 211, 2002-Ohio-4169, 773 N.E.2d 502, ¶ 16. In *Hayden*, we rejected the argument that a sexually oriented offender was entitled to a hearing to determine his status. As we said in *Hayden*, in regard to a sexually oriented offender under Megan's Law, " '[t]he trial court cannot "determine" anything. It merely engages in the ministerial act of rubber-stamping the registration requirement on the offender.' " Id. S.B. 10's classification of sex offenders into Tiers I, II, and III, operates in the same way—the tiers are automatically assigned by operation of law based on the crime of which the offender was convicted and not upon a judicial determination.

{¶ 99} Thus, for example, reclassification of Bodyke as a Tier III offender under S.B. 10 did not change a prior judicial determination that Bodyke was a sexually oriented offender under prior law, because that designation attached as a matter of law. Reflecting that designation in the sentencing judgment entry merely served to give the offender notice of the consequences of his conviction. See *Smith v. Doe* (2003), 538 U.S. 84, 96, 123 S.Ct. 1140, 155 L.Ed.2d 164 ("Although other methods of notification [of sex offender registration requirements] may be available, it is effective to make it part of the plea colloquy or the judgment of conviction").

{¶ 100} The offender's classification under prior law, which the lead opinion extols as an inviolate final judgment, instead is in effect a statutorily mandated notice, involving a matter collateral to the criminal sentence, inserted by statutory direction into the criminal sentence as a matter of convenience.

{¶ 101} It is for good reason, then, that nearly all the courts of appeals to have considered a separation-of-powers challenge like the one the lead opinion sustains here have rejected such a challenge. See, e.g., *Sewell v. State,* 181 Ohio App. 3d 280, 2009-Ohio-872, 908 N.E.2d 995 (1st Dist.); *State v. Barker*, 2d Dist. No. 22963, 2009-Ohio-2774; *Holcomb v. State,* 3d Dist. Nos. 8-08-23 to 8-08-26, 2009-Ohio-782; *State v. Randlett,* 4th Dist. No. 08CA3046, 2009-Ohio-112; *State v. Byers,* 7th Dist. No. 07 CO 39, 2008-Ohio-5051; *State v. Ettenger*, 11th Dist. No. 2008-L-054, 2009-Ohio-3525; *State v. Williams,* 12th Dist. No. CA2008-02-029, 2008-Ohio-6195. But see *Ettenger*, ¶ 86-96 (Grendell, J., concurring in judgment only) (opining that S.B. 10 violates separation of powers by vacating final judgment orders).

{¶ 102} Rather than directing courts to reopen prior judicial judgments and empowering an executive officer to rejudge defendants' sex-offender registration, classification, and reporting requirements, S.B. 10 repealed the law that required the notice of classification and registration to be inserted in the

sentence at sentencing. In the same bill, the General Assembly enacted a new classification and registration framework to be applied both to future convictions and (as at issue here) to existing convictions. As a consequence, the notices in the sentencing entries relate to classifications under the prior law that do not exist in the current law (e.g., habitual offender, sexual predator), because the underlying law has been repealed and replaced with another set of classifications (Tiers I, II, and III) and accompanying requirements.

{¶ 103} Rather than burden the courts with sifting the hundreds or thousands of sex offenders to which new and different requirements apply, the General Assembly assigned that administrative task to an executive officer, the attorney general. For the reasons explained above, however, this task neither requires nor permits the attorney general to open, overturn, or otherwise disturb the final judgments of conviction and sentence of any offender. Finally, S.B. 10 makes the attorney general's determination subject to an appeal to a trial court by a reclassified offender to ensure that the reclassification accords with the new law.

{¶ 104} Thus, the lead opinion misapprehends both the intent and effect of the reclassification mechanism employed by the General Assembly in S.B. 10. Because it does not work a legislatively mandated reopening of a final court decision, for the reasons set out above, it also does not offend the fundamental purpose and requirements of the separation-of-powers doctrine.

{¶ 105} I also agree with Justice O'Donnell's point that the lead opinion's disposition of this case on separation-of-powers grounds renders unnecessary any consideration of the extent to which stare decisis applies to constitutional claims. Because the lead opinion does not address the constitutional claims raised by appellants (other than separation of powers), there is no need for the court to delve into whether stare decisis requires us to reject the constitutional challenges to S.B. 10 on the authority of *State v. Cook* (1998), 83 Ohio St.3d 404, 700 N.E.2d 570; *State v. Williams* (2000), 88 Ohio St.3d 513, 728 N.E.2d 342; and

*State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110. Those decisions rejected constitutional challenges to Megan's Law (*Cook* and *Williams*) and the S.B. 5 amendments to that law (*Ferguson*). Our prior cases upholding Megan's Law and its amendments did not address a separation-of-powers issue as has been presented in this case. Consequently, the lead opinion's ruling in this case does not implicate the test for overruling precedent contained in *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256. Nor does its discussion, which is dicta, settle the issue.

{¶ 106} Because the lead opinion's decision does not rule on the remaining constitutional claims of appellants, I also decline to address them.

_____

Russell V. Leffler, Huron County Prosecuting Attorney, for appellee.

Gamso, Helmick & Hoolahan and Jeffrey M. Gamso; and Hiltz, Wiedemann, Allton & Koch Co., L.P.A., and John D. Allton, for appellants.

Jones Day, Elizabeth C. Radigan, and Louis A. Chaiten, urging reversal for amici curiae Iowa Coalition Against Sexual Assault, Association for the Treatment of Sexual Abusers, Jacob Wetterling Resource Center, Detective Robert A. Shilling, California Coalition Against Sexual Assault, Texas Association Against Sexual Assault, and National Alliance to End Sexual Violence.

Robert L. Tobik, Cuyahoga County Public Defender, and John T. Martin and Cullen Sweeney, Assistant Public Defenders, urging reversal for amicus curiae Cuyahoga County Public Defender.

Ian N. Friedman & Assoc., L.L.C., and Ian N. Friedman, urging reversal for amicus curiae Ohio Association of Defense Lawyers.

Timothy Young, Ohio Public Defender, and Kelly K. Curtis and Katherine A. Szudy, Assistant Public Defenders, urging reversal for amicus curiae Ohio Public Defender.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Mary H. McGrath, Assistant Prosecuting Attorney, urging affirmance for amicus curiae Cuyahoga County Prosecuting Attorney.

Ron O'Brien, Franklin County Prosecuting Attorney, and Steven L. Taylor, Assistant Prosecuting Attorney, urging affirmance for amicus curiae state of Ohio.

Richard Cordray, Attorney General, Benjamin C. Mizer, Solicitor General, Alexandra T. Schimmer, Chief Deputy Solicitor General, David M. Lieberman, Deputy Solicitor, Christopher P. Conomy, Assistant Solicitor, and James A. Hogan, urging affirmance for amicus curiae Ohio Attorney General.

_____